# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **STEPHEN G. McMAHAN,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:17cv00001 |
| | ) | **MEMORANDUM  OPINION** |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Stephen G. McMahan, ("McMahan"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.""'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McMahan protectively filed his applications for DIB and SSI on May 9, 2012, alleging disability as of December 1, 2011, due to diabetes, stroke, left ankle problems, right shoulder problems and hearing problems. (Record, ("R."), at 14, 203-08, 225.) The claims were denied initially and on reconsideration. (R. at 14, 94-121, 124-26, 132-36, 138-43, 145-47.) McMahan requested a hearing before an administrative law judge, ("ALJ"), which was held by videoconference, and at which McMahan was represented by counsel, on June 2, 2015. (R. at 35-64, 148-49.)

By decision dated July 31, 2015, the ALJ denied McMahan's claims. (R. at 14-29.) The ALJ found that McMahan met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2016. (R. at 16.) The ALJ found that McMahan had not engaged in substantial gainful activity since December 1, 2011, the alleged onset date. (R. at 16.) The ALJ found that the medical evidence established that McMahan had severe impairments, namely diabetes mellitus; history of left ankle fracture with nonunion; status-post cerebrovascular accident; status-post myocardial infarction; borderline intellectual functioning; and depressive disorder, but she found that McMahan did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-20.) The ALJ found that McMahan had the residual functional capacity to perform

repetitive, unskilled sedentary work[1] not requiring more than simple instructions, and he could occasionally lift and carry items weighing up to 20 pounds and up to 10 pounds frequently; could stand/walk for up to two hours and sit for up to six hours in an eight-hour workday; occasionally could push/pull, climb ramps and stairs, balance, kneel, stoop and crouch, but could never use foot controls, climb ladders, ropes or scaffolds, work on vibrating surfaces, crawl or drive; and he must avoid all exposure to hazardous machinery and unprotected heights. (R. at 20-27.) The ALJ found that McMahan was unable to perform his past relevant work. (R. at 27.) Based on McMahan's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that McMahan could perform, including jobs as a weight tester, a cuff folder and an assembler. (R. at 27-28.) Thus, the ALJ concluded that McMahan was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 29.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2017).

After the ALJ issued her decision, McMahan pursued his administrative appeals, (R. at 7-10), but the Appeals Council denied his request for review. (R. at 1-4.) McMahan then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2017). This case is before this court on McMahan's motion for

---

[1] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2017).

summary judgment filed August 14, 2017, and the Commissioner's motion for summary judgment filed September 13, 2017.

## II. Facts

McMahan was born in 1972, (R. at 38), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). McMahan has a 10th-grade education. (R. at 39). He has past relevant work as roof bolter and a scoop operator in an underground coal mine. (R. at 40.) McMahan testified at his administrative hearing that he left his job as a miner after suffering a stroke. (R. at 40.) McMahan testified that he also had suffered a heart attack and had seizures "all the time." (R. at 40.) McMahan said that he also had problems with his left ankle swelling and with immobility. (R. at 41.) He said that his left ankle was twice the size of his right ankle. (R. at 42.)

McMahan testified that he used a cane to walk long distances, which he defined as being more than "a couple of hundred yards." (R. at 42-43.) McMahan said that he could stand for only 10 minutes before needing to change positions. (R. at 43.) He said the amount of time he could sit would depend on the level of his blood sugar. (R. at 43-44.) He estimated that he could sit for only 15 minutes without changing positions and that he could lift item weighing up to 15 pounds. (R. at 44.) McMahan said that he has suffered from seizures ever since he was diagnosed as being diabetic. (R. at 44.) He said he has been treated for his seizure disorder with several different medications, but he could not name them. (R. at 44-45.)

McMahan said that his diabetes caused him to need to urinate every 20 minutes, day and night. (R. at 51.) He also said that he dropped objects often because he could not feel as well with his hands and that his feet tingle. (R. at 52.) McMahan said that various doctors have told him to elevate his left foot as much as possible. (R. at 52-53.) McMahan stated that he felt tired often and required a nap every day. (R. at 55.) McMahan also said that his health problems made him feel depressed. (R at 57.)

Ashley Wells, a vocational expert, was present and testified at McMahan's hearing. (R. at 58-63.) Wells was asked to consider a hypothetical individual of McMahan's age, education and work history, who was capable of lifting and carrying no more than 20 pounds occasionally, 10 pounds frequently, standing and walking no more than two hours and sitting for no more than six hours in an eight-hour workday, pushing and pulling occasionally, never using foot controls, no exposure to hazardous machinery, no working at unprotected heights, no climbing ladders, ropes or scaffolds or working on vibrating surfaces, no crawling, no required driving and occasional climbing of ramps and stairs, balancing, kneeling, stooping and crouching. (R. at 59-60.) Wells said that such an individual could not perform McMahan's past work, but could perform work as a weight tester, a cuff folder and an assembler. (R. at 60-61.) Wells stated that there were approximately 51,000 weight tester jobs in the national economy and 1,000 regionally, 23,000 cuff folder jobs in the national economy and 600 regionally and 39,000 assembler jobs in the national economy and 900 regionally. (R. at 61.) Wells stated that, if the same individual was able to understand, remember and carry out only simple instructions and perform repetitive, unskilled work, he could perform the previous listed jobs. (R. at 62.) Wells also stated that, if such an individual would be off-task

11 to 20 percent of the time, there would be no jobs available that he could perform. (R. at 62.)

In rendering her decision, the ALJ reviewed records from Dr. D. Kevin Blackwell, D.O.; Robert S. Spangler, Ph.D.; Tauna Gulley, F.N.P., and other providers with The Health Wagon; Wellmont Health System; Dr. Michael Ford, M.D., with Appalachia Medical Clinic, P.C.; Dr. Bennett E. Norton, M.D.; Dr. Fred A. Merkel, D.O.; Cynthia K. Dean, F.N.P.; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; and Dr. Robert Keeley, M.D., a state agency physician. McMahan's attorney also submitted medical reports from Doctor's Assisted Wellness & Recovery; Lonesome Pine Hospital; and Mountain View Regional Medical Center to the Appeals Council.[2]

The medical records show that McMahan has been treated for years for diabetes, depression and various other ailments and injuries. (R. at 335-45, 355-69.) McMahan has treated with narcotic pain medication since as early as 2001. (R. at 320.)

McMahan saw Dr. Michael Ford, M.D., with Appalachia Medical Clinic, P.C., on December 29, 2009, to establish care.[3] (R. at 498.) McMahan complained of diabetes and left ankle pain. (R. at 498.) Dr. Ford noted that McMahan's diabetes was severe and that his blood glucose level was 261. (R. at 498.) On

---

[2] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-4), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

[3] Much of this medical report is not legible.

February 1, 2010, McMahan complained of severe left ankle pain. (R. at 496.) Dr. Ford noted that he counseled McMahan to "[t]ake pain meds on time not before due or when they are not needed." (R. at 496.) He advised McMahan to rest, elevate his foot and to limit strenuous exercise. (R at 496.) On March 3, 2010, Dr. Ford wrote that McMahan had not followed through with lab tests or x-rays. (R. at 494.) He stated that no further prescriptions would be written until these were completed. (R. at 494.)

McMahan returned to see Dr. Ford on May 24, 2010, complaining of pain and decreased mobility in his left ankle. (R. at 493.) McMahan complained that he could not keep pain patches on his body due to sweat. (R. at 493.) Dr. Ford prescribed Zoloft for anxiety/depression symptoms. (R. at 493.) Dr. Ford ordered blood tests and an MRI of McMahan's left ankle. (R. at 493.)

On August 4, 2010, McMahan sought treatment at the emergency department of Lonesome Pine Hospital for swollen wounds on his lower legs and left ankle. (R. at 370-71.) McMahan was admitted for three days for inpatient treatment by Dr. Ford. (R. at 372-75.) McMahan stated that he lost his job in the mines on the day of his hospital admission because he showed his boss the open wounds on his legs. (R. at 372.) McMahan stated that he wore mud boots in the mine, which caused his legs to sweat and prevented the wounds from healing. (R. at 372.) An x-ray of McMahan's left ankle suggested osteomyelitis, which Dr. Ford stated required hospital admission to treat. (R. at 372.) The x-ray also revealed and old nonunion fracture. (R. at 372-73.) McMahan admitted to a previous history of drug and alcohol abuse. (R. at 373.) Dr. Ford diagnosed open cellulitis with open wounds on both legs. (R. at 373.)

Dr. Ford noted that McMahan was completely noncompliant with a diabetic diet while in the hospital, with visitors bringing him outside food such as soft drinks, candy bars and ice cream bars. (R. at 374.) On discharge, Dr. Ford stated that McMahan had severe degenerative arthritis of the left talotibial joint with old nonunion fracture of the distal tibial epiphysis. (R. at 374.)

On August 23, 2010, McMahan stated that he was feeling much better, but was applying for disability benefits. (R. at 492.) Dr. Ford noted that McMahan's musculoskeletal examination showed no atrophy with intact joints and normal gait. (R. at 492.) He also noted normal mood. (R. at 492.) Despite a fairly benign examination, Dr. Ford wrote, patient is "disabled." (R. at 492.) McMahan saw Dr. Ford again on August 31, 2010, to fill out "papers." (R. at 491.)

On October 4, 2010, Dr. Ford prescribed Oxycontin and Lortab for McMahan. (R. at 473, 490.) There is no record showing that Dr. Ford saw McMahan on this occasion. Dr. Ford continued prescribing these medications through at least January 31, 2012. (R. at 471-73.)

Dr. Ford did see McMahan again on October 27, 2010. (R. at 489.) On this occasion, McMahan complained of two open ulcers on the back of his head causing him severe pain. (R. at 489.) Dr. Ford noted that McMahan's musculoskeletal examination showed no atrophy or weakness, intact joints and a normal gait. (R. at 489.) Dr. Ford also noted that McMahan had been fired from his job and was pursuing unemployment benefits. (R. at 489.) McMahan sought treatment on December 15, 2010, for a large abscess on his face. (R. at 488.) On December 27, 2010, Dr. Ford noted that the abscess had healed. (R. at 487.)

On January 27, 2011, McMahan returned to Dr. Ford complaining of increased pain and swelling in his left ankle. (R. at 486.) Based on his examinations, Dr. Ford noted no deformity or swelling in McMahan's extremities and no atrophy or weakness with intact joints and a normal gait. (R. at 486.) McMahan stated that his pain medication was "not helping," and he wanted to switch to Oxycontin. (R. at 486.) Dr. Ford warned McMahan of the potential for drug abuse. (R. at 486.)

On March 1, 2011, Dr. Ford noted that McMahan's fasting blood sugar level was 61, making him drowsy; Dr. Ford gave McMahan something to eat and a soft drink. (R. at 485.) Dr. Ford also noted that McMahan had returned to work and was working while taking his pain medication. (R. at 485.) McMahan returned on April 1, 2011, complaining of pain in his left ankle. (R. at 484.) Dr. Ford noted that McMahan was scheduled to see an orthopedic doctor at the University of Virginia later in the month. (R. at 484.) McMahan said that his pain was controlled "fairly well" with medication. (R. at 484.) Dr. Ford noted that McMahan walked with a limp and that his left ankle was swollen. (R. at 484.) Otherwise, he noted no atrophy, intact joints, no deformity in McMahan's extremities, normal mood and symmetrical reflexes. (R. at 484.) Dr. Ford advised McMahan to elevate his left foot as often as possible to reduce the swelling and pain and to take his pain medication as ordered. (R. at 484.) On May 3, 2011, Dr. Ford noted no swelling in McMahan's extremities and a normal gait. (R. at 483.) He stated that he saw McMahan for chronic pain management. (R. at 483.) Dr. Ford noted that McMahan was "back to working against my recommendation but he can't afford not to work…." (R. at 483.)

On June 2, 2011, McMahan reported that he had gone to the emergency department at Lonesome Pine Hospital on May 9, 2011, and was diagnosed with shingles. (R. at 482.) Dr. Ford stated that what he observed did not clearly appear to be shingles. (R. at 482.) On July 5, 2011, Dr. Ford noted no atrophy or weakness with intact joints and an altered gait with no deformity or swelling in McMahan's extremities and a normal mood. (R. at 481.) Nonetheless, Dr. Ford assessed chronic pain in back and legs and depression. (R. at 481.) He prescribed Oxycontin and Lortab and warned McMahan to be careful operating machines at work or driving when taking pain medications due to drowsiness/dizziness. (R. at 481.) Dr. Ford suggested that McMahan might try to use some alternative methods of pain relief such as warm moist heat and cool cloths. (R. at 481.) On August 10, 2011, McMahan complained of swelling and pain in his left ankle, but Dr. Ford noted no deformity or edema in his extremities. (R. at 480.) He also noted no atrophy or weakness, intact joints and a normal gait. (R. at 480.)

McMahan sought treatment at Lonesome Pine Hospital on September 20, 2011, complaining of feeling tired and sleepy for two to three days. (R. at 432-37.) McMahan's wife reported that he had a prolonged hypoglycemic seizure three days earlier, which lasted about a half hour. (R. at 432.) Since then, she said, McMahan had been sleeping excessively. (R. at 432.) A CT scan of McMahan's head was interpreted as normal, but a urine drug screen was positive for the use of benzodiazepines and cocaine. (R. at 433, 440-41.) Despite his prescribed pain medications from Dr. Ford, his urine screen was negative for the use of opiates. (R. at 442.)

McMahan sought treatment at the emergency department of Holston Valley Medical Center on September 22, 2011, complaining of weakness in his left side.

(R. at 458-59.) McMahan complained of a seizure, which left him feeling weak in his left leg and arm and with slurred speech. (R. at 458.) Oddly, the treating physician noted weakness on McMahan's right side. (R. at 459.) A CT scan of McMahan's head was ordered, which showed evidence consistent with a stroke. (R. at 459, 469.)

When McMahan returned to see Dr. Ford on September 26, 2011, he complained of weakness in his left side and hand, slurred speech and a slow, unsteady gait due to a stroke. (R. at 479.) McMahan said that he had a "seizure," and when he went to work, he could not do much, so he went to the hospital where he was diagnosed as suffering from a stroke. (R. at 479.) Dr. Ford noted that McMahan told him that he wanted to return to work as soon as possible. (R. at 479.) On September 29, 2011, McMahan stated that he was doing much better, with improved speech and gait and no numbness. (R. at 478.) Dr. Ford noted that McMahan's stroke symptoms had resolved and approved him returning to work, although he noted some continuing weakness in his left arm. (R. at 478.)

McMahan reported to feeling much better on October 28, 2011, with much less evidence of effects of a stroke. (R. at 477.) He did report some numbness on the left side of his body, especially in his left leg. (R. at 477.) He also reported being unsteady due to poor balance with frequent falls. (R. at 477.) Dr. Ford noted no atrophy or weakness, intact joints, normal gait, no deformity or swelling in McMahan's extremities, normal mood and symmetrical reflexes. (R. at 477.) Dr. Ford cautioned McMahan to rise from lying/sitting positions slowly and wait until he felt more steady before continuing and to make turns or changes in directions slowly to prevent falls. (R. at 477.) Dr. Ford prescribed Oxycontin, Lortab, Zoloft and Klonopin. (R. at 477.)

On November 29, 2011, McMahan returned, complaining of wounds on both of his feet. (R. at 476.) On December 28, 2011, McMahan complained of swelling in his ankle. (R. at 475.) Dr. Ford noted no deformity or swelling in his extremities, no atrophy or weakness and a normal gait. (R. at 475.) Dr. Ford also diagnosed anxiety, although he noted that McMahan's mood was normal. (R. at 475.) He prescribed Oxycontin, Lortab and Klonopin. (R. at 475.) On January 31, 2012, McMahan complained of left ankle swelling and left side weakness. (R. at 474) Nonetheless, Dr. Ford noted no swelling or deformity in his extremities and no atrophy or weakness with intact joints and a normal gait. (R. at 474.)

On November 11, 2012, Dr. D. Kevin Blackwell, D.O, examined McMahan at the request of Disability Determination Services. (R. at 503-06.) Dr. Blackwell noted that McMahan had suffered a stroke in September 2011. (R. at 503.) McMahan also gave a history of insulin-dependent diabetes and seizure disorder. (R. at 503.) Dr. Blackwell noted that McMahan was alert, cooperative and oriented with good mental status, and he did not appear to be in any acute distress. (R. at 504.) Dr. Blackwell's examination was normal, with the exception that he noted that McMahan walked with a limp and that his left ankle was swollen with decreased range of motion. (R. at 504-05.) He found that the ranges of motion in all of McMahan's joints were within normal limits, except for the ranges of motion in McMahan's left ankle. (R. at 507.) Dr. Blackwell also noted weakness in McMahan's left shoulder and grip strength and decreased sensation in his lower extremities bilaterally. (R. at 505.)

Dr. Blackwell opined that McMahan was able to stand for two hours and sit for six hours in an eight-hour workday; to reach above head with his right arm one-third of the day, but should avoid such reaching with the left arm; to use foot pedal

controls with his right foot one-third of the day, but should avoid operating foot pedal controls with his left foot; to squat and kneel one-third of the day; to occasionally lift items weighing up to 40 pounds and frequently lift items weighing up to 15 pounds; and should avoid crouching, crawling, repetitive and continuous stair climbing and work around unprotected heights. (R. at 505.)

Dr. Robert Keeley, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of McMahan on December 5, 2012. (R. at 87-89.) Dr. Keeley stated that, based on his review of the medical evidence, McMahan could occasionally lift and carry items weighing up to 20 pounds, frequently lift and carry items weighing up to 10 pounds, stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday and sit with normal breaks for a total of about six hours in an eight-hour workday. (R. at 88.) Dr. Keeley stated that McMahan's ability to push and/or pull, including the operation of hand and/or foot controls, was limited to occasionally in his left lower extremity. (R. at 88.) Dr. Keeley also stated that McMahan could never climb ladders, ropes or scaffolds, should avoid concentrated exposure to hazards, such as machinery and heights, and to vibration and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 88-89.)

Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique on McMahan on December 6, 2012. (R. at 85-86.) Leizer stated that McMahan suffered from a nonsevere anxiety disorder. (R. at 86.) He stated that McMahan's mental impairments resulted in no restrictions of activities of daily living, no difficulties in maintaining social functioning, no repeated episodes of extended duration decompensation and only mild difficulties in maintaining concentration, persistence or pace. (R. at 86.) Leizer stated that

McMahan's mental impairment did not meet the criteria for the listing for anxiety-related disorder. (R. at 86.)

Pharmacy records show that McMahan was treating with Suboxone in 2013. (R. at 753, 784-86.) He apparently received the prescription from Dr. Michael D. Tino, M.D., with Doctor's Assisted Wellness & Recovery. (R. at 711-60.)[4]

Dr. Robert McGuffin, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of McMahan on December 11, 2013. (R. at 103-05.) Dr. McGuffin stated that, based on his review of the medical evidence, McMahan could occasionally lift and carry items weighing up to 20 pounds, frequently lift and carry items weighing up to 10 pounds, stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday and sit with normal breaks for a total of about six hours in an eight-hour workday. (R. at 103-04.) Dr. McGuffin stated that McMahan's ability to push and/or pull, including the operation of hand and/or foot controls, was limited to occasionally in his left lower extremity. (R. at 104.) Dr. McGuffin also stated that McMahan could never climb ladders, ropes or scaffolds, should avoid even moderate exposure to hazards, such as machinery and heights, avoid concentrated exposure to vibration and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 104-05.)

Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique on McMahan on December 11, 2013. (R. at 101-02.) Leizer stated that McMahan suffered from a nonsevere anxiety disorder and a nonsevere affective disorder. (R. at 101.) He stated that McMahan's mental impairments

---

[4] Many of these records are not legible.

resulted in no restrictions of activities of daily living, no difficulties in maintaining social functioning, no repeated episodes of extended duration decompensation and only mild difficulties in maintaining concentration, persistence or pace. (R. at 102.) Leizer stated that McMahan's mental impairments did not meet the criteria for the listings for affective disorder or anxiety-related disorder. (R. at 101-02.)

Robert Spangler, Ph.D., a psychologist, performed a psychological evaluation of McMahan on February 22, 2014. (R. at 509-12.) McMahan told Spangler he suffered from poorly controlled diabetes and one or two seizures a month. (R. at 509-10.) Spangler noted that McMahan was clean, appropriately dressed and cooperative. (R. at 509.) McMahan reported vision problems and said that his vision was bad when his blood sugar was high. (R. at 509.) Spangler also noted that McMahan had "obvious" hearing difficulties, forcing him to repeat questions. (R. at 509.) Spangler noted that McMahan had awkward gross motor movements with a slow, stiff gait. (R. at 509.) He stated that McMahan's left ankle was swollen and very stiff and that his left side was weak secondary to a "recent" stroke. (R. at 509.) Spangler noted a pronounced limp and awkward and slow fine motor movements. (R. at 509.) McMahan told Spangler that he would get dizzy if he closed his eyes. (R. at 509.)

Spangler noted that McMahan appeared socially confident, anxious and depressed. (R. at 509.) He stated that McMahan needed instructions repeated, but this was due to hearing problems. (R. at 509.) He noted that McMahan demonstrated good concentration for about 20 minutes, then his concentration varied. (R at 509.) He said that McMahan was appropriately persistent on tasks, but his pace was impacted by varied concentration after 20 minutes. (R. at 509.)

Spangler noted that McMahan's hands were swollen and that he reported tingling in his hands. (R. at 509.)

McMahan stated that his medical and mental problems began 12 years earlier when he injured his left ankle working as a roof bolter in and underground mine. (R. at 510.) McMahan told Spangler that he had been disabled since his stroke in 2011. (R. at 510.) McMahan said that he would get dizzy, had hypertension, arthritis in his left ankle and hand, a bowel disorder, urinary incontinence and intermittent neck and low back pain. (R. at 510.)

Spangler noted that McMahan was alert and oriented, had an adequate recall of remote events, but an inadequate recall of recent events. (R. at 510.) McMahan had fair eye contact; his motor activity was tense; his affect was restricted; and his mood was anxious and depressed. (R. at 510.) Spangler noted that McMahan was able to repeat 0 words after five minutes; repeated 7 numbers presented serially forward and 5 numbers backward, but could not do serial 7s or serial 3s. (R. at 510.) He was able to do serial 5s. (R. at 510.) He could not interpret common proverbs adequately. (R. at 510.) Spangler noted that McMahan exhibited no illogical or loose associations. (R. at 511.) He stated that McMahan's judgment and insight were consistent with low average intelligence. (R. at 511.) He noted that McMahan's stream of thought was concrete, associations were logical and thought content was nonpsychotic. (R at 511.) Spangler noted that McMahan's social skills were adequate, and he related well. (R. at 511.)

Spangler administered a Weschler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), on which McMahan obtained a Verbal Comprehension Index score of 81, a Perceptual Reasoning Index score of 77 and a Full-Scale IQ score of 75.

(R. at 511-12.) Spangler diagnosed McMahan with generalized anxiety disorder, moderate; persistent depressive disorder, moderate to severe; borderline intelligence; marginal math and reading skills; and recent memory impairment, moderate. (R. at 512.)

Spangler also completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) on February 22, 2014. (R. at 513-15.) Spangler stated that McMahan had a fair or seriously limited ability to follow work rules, to relate to co-workers, to deal with public, to use judgment, interact with supervisors, to function independently, to maintain attention and concentration after 20 minutes, to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 513-14.) He stated that McMahan had a poor or no useful ability to deal with work stresses, to understand, remember and carry out complex or detailed job instructions and to demonstrate reliability. (R. at 513-14.) Spangler stated that McMahan would be absent from work due to his mental impairments and/or treatment more than four days a month. (R. at 515.)

Tauna Gulley, F.N.P. with The Health Wagon, saw McMahan to establish new patient care on September 27, 2013. (R. at 523-25.) McMahan gave a history of no job and no insurance and was requesting help with his diabetes medication. (R. at 523.) McMahan complained of a painful left ankle, which was swollen. (R. at 523.) McMahan walked with a limp due to his left ankle problem. (R. at 523.) He denied any anxiety or depressed mood. (R. at 523.) He gave a history of a stroke two years earlier. (R. at 523.) Gulley stated that McMahan was alert and oriented and in no acute distress. (R. at 524.) She noted that McMahan's nonfasting blood glucose level was 114. (R. at 524.) She diagnosed McMahan with

hypertension and diabetes mellitus, type II, uncontrolled. (R. at 524.) She gave McMahan sample medication. (R. at 524.)

McMahan saw Gulley again on October 25, 2013. (R. at 521-22.) Gulley noted that McMahan's nonfasting blood glucose level was 280. (R. at 521.) She also noted that McMahan was in no distress, with clear speech and logical thought processes. (R. at 521.) McMahan returned to see Gulley on June 30, 2014. (R. at 519-20.) McMahan complained of pain in his left ankle and right shoulder, and he requested a note from Gulley to receive food stamps. (R. at 519.) Again, Gulley noted that McMahan was alert and oriented, in no distress and cooperative with good eye contact. (R. at 519.) She did note swelling in his left ankle. (R. at 519.) McMahan denied any dizziness, fainting or irritability. (R. at 520.)

Mary Beth Bentley, F.N.P. with The Health Wagon, saw McMahan on September 8, 2014. (R. at 533-34.) Bentley noted that McMahan was in no acute distress and was well-developed and well-nourished. (R. at 533.) She noted that McMahan's neck was supple with full range of motion. (R. at 533.) She did note swelling, deformity and limited range of motion in McMahan's left ankle. (R. at 533.) She noted that McMahan's motor strength was normal in his upper and lower extremities. (R. at 533.) McMahan told Bentley that his blood sugar level averaged around 200. (R. at 534.) McMahan denied any change in appetite, fatigue, fever, headache, lightheadedness, night sweats or sleep disturbance. (R. at 534.) He also denied any dizziness, weakness, chest pain, shortness of breath, anxiety, depressed mood and substance abuse. (R. at 534.)

McMahan returned to see Bentley on September 22, 2014. (R. at 529-31.) McMahan reported that his medication dosage was recently changed because his

glucose level was consistently staying between 300 and 400. (R. at 530.) McMahan denied any vision problems, chest pain, difficulty breathing, irritability, loss of strength, loss of use of extremities, anxiety, depressed mood, difficulty sleeping and illicit drug use. (R. at 530-31.)  Bentley noted that McMahan's motor strength was normal in the upper and lower extremities with sensory exam intact. (R. at 529.) She stated that he was alert, oriented and cooperative, he made good eye contact, he had good judgment and insight, intact cognitive function, clear speech and thought content without suicidal ideations or delusions, and thought processes were logical and goal-directed. (R. at 529.)

McMahan returned to see Gulley on October 31, 2014. (R. at 527-28.) McMahan gave a history of having to relearn how to walk and talk after suffering a stroke two years earlier. (R. at 527.) She also noted that he had suffered an injury to his left ankle while working in the mines. (R. at 527.) McMahan said that he had lost a lot of function in his ankle and that it hurt him on a daily basis. (R. at 527.) He also claimed that he suffered from seizures if his blood sugar level was low. (R. at 527.) Gulley noted that McMahan's diabetes had been difficult to control and noted that his nonfasting blood glucose level was 232. (R. at 527.) Gulley noted that McMahan was alert, cooperative and in no distress, with left foot tenderness and swelling in his left ankle. (R. at 527.)

Gulley completed an Assessment Of Ability To Do Work-Related Activities (Physical) for McMahan on October 31, 2014, stating that McMahan could lift items weighing less than five pounds, but could not carry items. (R. at 516-18.) Gulley stated that McMahan could stand and walk for "only minutes" at a time during the work day due to a left ankle fracture. (R. at 516.) She stated that McMahan's ability to sit was not affected, but that he could never climb, stoop,

kneel, balance, crouch or crawl and should avoid working around heights, moving machinery, temperature extremes, chemicals, dust, noise, fumes, humidity and vibration. (R. at 516-17.) Gulley stated that McMahan's abilities to reach, to handle, to feel, to push/pull, to see, to hear and to speak were not affected. (R. at 517.)

McMahan was admitted to Mountain View Regional Medical Center for treatment of diabetic ketoacidoses on March 17, 2015. (R. at 873.) McMahan was brought to the emergency room by ambulance due to altered mental state. (R. at 868.) Emergency personnel stated that they found McMahan on the ground at his home, poorly responsive, agitated and combative. (R. at 868.) According to McMahan's girlfriend, McMahan had a history of juvenile diabetes, narcotic dependence and was then taking Subutex. (R. at 861.) McMahan's girlfriend said that he complained of nausea, began moaning and became "groggy" and confused. (R. at 861.) She said that they attempted to check his blood sugar level, but it would not read, so a shot of glucose was given. (R. at 861.) McMahan's condition did not improve, so he was transported to hospital by ambulance. (R at 862.) The Physical Exam notes reflect that McMahan was oriented to person, place and time, but he appeared in distress and was restrained in the emergency department. (R. at 869.) Lab tests suggested that McMahan had suffered a heart attack caused by his severe ketoacidosis. (R. at 642, 860.) Upon admission, his blood glucose level was 1267. (R. at 642, 852.)

McMahan was discharged three days later on several medications, with instructions to follow up with his principal health care provider, a cardiologist and an endocrinologist. (R. at 851-54, 872.)

McMahan followed up with Gulley on March 27, 2015, and reported that he was doing much better. (R. at 539.) Gulley noted that McMahan was alert and in no distress. (R at 539.) She stated that he ambulated without difficulty with a mild limp and was alert, oriented and cooperative. (R. at 539.)

The record shows that McMahan was in Subutex treatment for opiate dependency from February 8, 2013, to at least August 4, 2015. (R. at 680-709, 711-60, 841-48.)

On June 25, 2015, McMahan sought treatment at the Emergency Department at Lonesome Pine Hospital for foot pain and swelling without injury. (R. at 802-06.) McMahan gave no history of injury, but stated he had helped his friend move furniture two days earlier. (R at 802.) It was noted that McMahan's ankle and foot were swollen. (R. at 806.) X-rays of McMahan's left ankle showed no acute bony abnormalities, but an old fracture of the tibia and fibula and advanced degenerative osteoarthritis of the ankle joint. (R. at 805, 808-09.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2017). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is

not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2017).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011, West 2012 & Supp. 2018); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir.

1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if she sufficiently explains her rationale and if the record supports her findings.

McMahan argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-8.) McMahan also argues that the ALJ erred by finding that a significant number of jobs existed that he could perform. (Plaintiff's Brief at 8-9.) In this case, the ALJ found that McMahan had the residual functional capacity to perform repetitive, unskilled sedentary work not requiring more than simple instructions, and he could occasionally lift and carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently; could stand/walk for up to two hours and sit for up to six hours in an eight-hour workday; occasionally could push/pull, climb ramps and stairs, balance, kneel, stoop and crouch, but could never use foot controls, climb ladders, ropes or scaffolds, work on vibrating surfaces, crawl or drive; and he must avoid all exposure to hazardous machinery and unprotected heights. (R. at 20-27.)

Under 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2), 404.1546 and 416.946, the ALJ is not bound by any findings from a medical source as to a claimant's residual functional capacity. Rather, the responsibility for determining a claimant's residual functional capacity rests with the ALJ, and the ALJ can determine the value to give a medical source's opinions according to the factors listed in 20 C.F.R. §§ 404.1527(c), 416.927(c). In reaching his decision with regard to

McMahan's residual functional capacity, the ALJ listed and considered all of the medical evidence of record, including the opinions of the examining physician, Dr. Blackwell, and the treating nurse practitioner, Gulley. In doing so, the ALJ credited Dr. Blackwell's opinion, except for his preclusion of reaching and crouching. These limitations were not supported by any other reviewing or treating physician. Therefore, the ALJ was free to reject these restrictions as being unsupported by the other substantial evidence of record.

The ALJ also rejected Gulley's limitations as not being supported by her own treatment records. Gulley's treatment records list few objective findings to support any limitations on McMahan's residual functional capacity other than swelling and limited range of motion in his left ankle, as well as his blood sugar levels. Thus, Gulley's own records do not support her severe restrictions on McMahan's ability to lift and carry. Regarding her severe restrictions on McMahan's ability to stand and walk, McMahan reported to Gulley's co-worker, Bentley, in September 2014, that he suffered from no loss of strength or loss of use of his extremities. (R. at 530-31.) Bentley noted no loss of strength in either McMahan's upper or lower extremities. (R. at 529.)

Based on the above, I find that substantial evidence supports the ALJ's weighing of the medical evidence and her finding as to McMahan's residual functional capacity. McMahan also argues that substantial evidence does not support the ALJ's finding as to other available work that McMahan could perform. The vocational expert, Wells, testified that an individual of McMahan's age, education, past work experience and residual functional capacity as found by the ALJ could perform work as a weight tester, a cuff folder and an assembler. (R. at 61-62.) Wells stated that there were approximately 51,000 weight tester jobs in the

national economy and 1,000 regionally, 23,000 cuff folder jobs in the national economy and 600 regionally and 39,000 assembler jobs in the national economy and 900 regionally. The Court of Appeals for the Fourth Circuit stated in *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979), that 110 jobs in the region would not constitute an insignificant number. In *Craigie v. Bowen*, 835 F.2d 56, 58 (3rd Cir. 1987), the Third Circuit also stated that 200 jobs in the region was a clear indication that there existed in the national economy other substantial gainful work which a claimant could perform. Therefore, I find that the vocational expert's testimony supports the ALJ's finding on this issue.

Based on the above-stated reasons, I find that substantial evidence supports the Commissioner's decision that McMahan was not disabled. An appropriate Order and Judgment will be entered.

DATED:     August 8, 2018.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE